## COLGATE–PALMOLIVE–PEET CO. et al. v. LEVER BROS. CO.

### No. 306.

District Court, N. D. Indiana, Hammond Division.

Sept. 13, 1935.

Crumpacker & Friedrich, of Hammond, Ind., Allen & Allen, of Cincinnati, Ohio, Lines, Spooner & Quarles, of Milwaukee, Wis., Mason Trowbridge, of Jersey City, N. J., and Dinsmore, Shohl, Sawyer & Dinsmore, of Cincinnati, Ohio (Newton D. Baker and Arthur C. Denison, both of Cleveland, Ohio, Marston Allen, of Cincinnati, Ohio, and Louis Quarles, of Milwaukee, Wis., of counsel), for plaintiffs.

Frank Parker Davis, of Chicago, Ill., Ramsay Hoguet, of New York City, John B. Macauley, of Chicago, Ill., C. B. Tinkham, of Hammond, Ind., Floyd S. Davis, of Cambridge, Mass., Leroy C. Shonts, of Chicago, Ill., and H. A. English, of New York City, for defendant.

SLICK, District Judge.

This suit is brought by two very large manufacturers of soap, the joint owners of a process and product patent, against a third large manufacturer, and, of course, a competitor. Defendant has engaged in producing and selling a granulated spray dried soap since 1919. Its product has been characterized in this suit as old, intermediate, and modern Rinso. Naturally in an effort to keep abreast of the times, produce an article desired by the trade and excel commercially as far as possible, defendant has from time to time changed and improved its product. While its first product, old Rinso, was acceptable to the trade and no doubt profitable to defendant, it was improved from time to time until it became the intermediate Rinso. Neither of these products, old or intermediate Rinso, is accused of infringing either of plaintiffs' patent.

In 1927 the Lamont patent was issued. It is quite apparent that Lamont in his application and specifications attempted to cover every possible description of a successful spray dried soap product. He at great length described the character of the soap used, the method pursued, the apparatus used, process variables, and characteristics of the product produced, the size of the particles in the product, range limits of temperatures of both soap and drying gas or heated air, his reasons for and results which he was able to obtain, variation in the size of the particles, solubility and thickness of the walls of the particles, tests made as to solubility, bulk, weight, freedom from lumping, etc.

While an inventor is entitled to the full benefit of his invention and the patent issued thereon, care must be taken to protect the public against extravagant claims and claims of invention covering matters already known and practiced in the art. This case furnished a good example of difficulties frequently encountered in differentiating between old processes and a new process embracing and overlapping many known properties.

The original bill declared upon two patents. However, plaintiffs now rely entirely on the patent issued to Lamont, being patent No. 1,652,900. Plaintiffs claim that the Lamont patent applies to spray dried neat soap, which is puffed as a result of being sprayed into an air current of the proper temperature with the correct temperature of the soap fluid at the spray nozzle.

Soap is a substance of peculiar and extraordinary properties, difficult to handle, and extremely hard to spray dry. It is divided by soap makers into three classes, namely, neat or kettle soap, middle soap, and nigre soap. Neat soap is free flowing and when water is added does not thin as would naturally be expected, but becomes thicker, less tractable, and reverts into what is called middle soap, and, if enough water is added, becomes nigre.

Spray drying is an old art, but it is reasonably new when applied to soap. If it is desired to prepare soap to be spray dried, that is, secure the proper fluidity, it is necessary to raise the temperature of the soap. Fluidity is obtained therefore by increasing the temperature, not by increasing the water content. All this was known to the art and to the practical soap maker long prior to 1927.

Lamont describes a preferred product, and, if what he designates as preferred product is to be the guide, defendant's product, modern Rinso, does not infringe. The Lamont process contemplates ejecting the soap into a current of heated air that flows in the same direction as the soap is sprayed. This is termed concurrent spraying.

In defendant's process of manufacturing, the soap fluid is ejected into air currents that vary in direction, but about 75 per cent. of these currents of hot air run counter to the direction of the spray. This is called counter current spraying. Thus, while the Lamont process contemplates concurrent spraying, the defendant's process is three-fourths, or about 75 per cent. counter current.

Lamont says in his specifications that the particular process conditions discovered by him are principally initial air temperatures and soap temperature, meaning, of course, the temperature of the treating gas or hot air into which the soap is sprayed and the temperature of the soap as it leaves the spray nozzle. His preferred temperatures for spraying soap of a solid content of 60 per cent. are, for the soap in the soap line 220° F. to 230° F. and for the drying air 450° F. to 500° F. It should be noted that the soap line temperature as taken by Lamont corresponds to a soap temperature at the point of discharge from the nozzle of about 250° F. to 260° F. He does not limit the scope of his claims to these temperatures, but strongly recommends them, advising the operator to coordinate these temperatures with other process variables so as to produce the best possible product. He explains that if the temperature of the air into which the soap is sprayed is too low, the particles in the finished product are irregular and distorted, and if the air temperature is too high, they will be disrupted and have the appearance of broken shells. He also claims that spraying at proper air temperature, such as he describes, tends to create steam inside the soap particles.

The Lamont patent describes a process which ejects the soap liquid into a current of superheated air flowing concurrently with the spray and in which air current there is substantially no whirling or eddying, so that all sprayed particles of soap contact the drying air at substantially the same temperature, and, finally, the product manufactured under the Lamont patent is of such texture that it may be and is taken

directly to the bins and is ready for shipment to the trade.

The question then arises, How nearly may these variables be approximated without infringing? The rational answer would seem to be that they may be approximated within a reasonable degree.

Defendant, since it began producing and marketing its product in 1919, made many changes, and it was not required to stop improving its product because of the issuance of the Lamont patent in 1927. Indeed, it should be commended for the improvements developed and for producing the very best article possible. In addition to the fact that 75 per cent. of defendant's soap is sprayed into counter currents in counter distinction to plaintiffs' concurrent process, the fact is that 75 per cent. of defendant's soap is sprayed into treating gas or hot air at a temperature less than 212° F., whereas, the plaintiffs' specifications call for air temperature of 450° F. to 500° F., and, further, the temperature of the soap, sprayed at the nozzle, in defendant's process is not over 200° F., whereas Lamont specifies the equivalent of 250° F. to 260° F. Plaintiffs claim a product uniform, well rounded and hollow, and free from dust, whereas defendant's product has hard particles and oversized particles of about 20 per cent. and dust particles of from 10 per cent. to 15 per cent.

In other words, Lamont in his patent and in his process relies on a product which is produced by spraying soap at a temperature of 250° F. to 260° F. at the nozzle into air which has been superheated to from 450° F. to 500° F., the product produced being puffed because steam is created in the particle, and the particle size being very even, frequently hollow, free flowing with practically no dust. Comparing defendant's modern Rinso, which is under attack, we have a product that is produced by spraying the same kind of soap, in other words, neat soap, or soap containing about 40 per cent. of water and therefore having about 60 per cent. solid content; this soap being sprayed at 200° F. or less into air currents that are whirling and eddying and practically counter current, at least 75 per cent. counter current, and the air temperature of 75 per cent. being less than 212° F. at the point of contact. And we have Lamont specifying that all particles of soap contact the treating gas at practically the same temperature, whereas 75 per cent. of defendant's product contacts the treating gas at considerably less than 212° F. Defendant's product is not of uniform size and must be screened before being put upon the market commercially, and has at least 20 per cent. of hard or oversized particles. It is not well rounded, not uniform in size, and has 15 per cent. of dust.

While defendant's product resembles to the casual observer the product of plaintiffs, it, in many respects, is quite dissimilar. I therefore conclude that neither defendant's process nor its product infringes on the patent of plaintiffs.